1

2

3

4

5

6

7

8                          UNITED STATES  DISTRICT COURT

9                            Northern District of California

10                             SAN FRANCISCO DIVISION

11   SUSAN CAROL NIELSEN,                    No. C 11-03379 LB

12              Plaintiff,                   **ORDER REGARDING CROSS-**
                                             **MOTIONS FOR SUMMARY**
13         v.                                **JUDGMENT**

14   CAROLYN W. COLVIN,
     Acting Commissioner of                  **[ECF Nos.  22 & 23 ]**
     Social Security Administration,
15

16              Defendant.
     _____/

17                              **I.  INTRODUCTION**

18       Plaintiff Susan Nielsen moves for summary judgement, seeking judicial review of a final

19   decision by the Commissioner of Social Security Administration[1] denying Plaintiff Social Security

20   Income disability benefits for her claimed disability of degenerative disc disease, hydrocephalus

21   with associated epilepsy and imbalance, obesity and alcohol dependence.  Motion, ECF No. 22.[2]

22   The Administrative Law Judge ("ALJ") found that Plaintiff had four severe impairments but

23   declared her not disabled and denied Social Security Income ("SSI") disability benefits.

24

25   _____

26       [1]  At the time this action was filed, Michael Astrue, who was at that time the Commissioner,
     was named as the Defendant.  Carolyn Colvin, the Acting Commissioner, has now been substituted
27   as the Defendant.

28       [2]  Citations are to the Electronic Case File ("ECF") with pin cites to the electronic page
     number at the top of the document, not the pages at the bottom.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Administrative Record ("AR") at 33.

2        Pursuant to Civil Local Rule 16-5, the matter is deemed submitted for decision by this court

3    without oral argument.  All parties consented to the court's jurisdiction.  *See* ECF Nos. 32 & 333.

4    For the reasons stated below, the court **GRANTS IN PART AND DENIES IN PART** Plaintiff's

5    motion for summary judgment, **DENIES** the Commissioner's cross-motion for summary judgement,

6    and **REMANDS** this case to the Social Security Administration for further proceedings regarding

7    the Residual Functional Capacity analysis.

8                          **II.  PROCEDURAL HISTORY**

9        Plaintiff, now 58, applied for disability benefits on February 24, 2009.  AR 176.  She alleged that

10   she had been disabled since May 22, 2007 as a result of six herniated discs in her neck.  AR 179.

11   The Commissioner denied her application both initially and upon reconsideration.  AR 105-108,

12   110-114.  On September 28, 2009, Plaintiff timely requested a hearing before an ALJ.  AR 118-119.

13   ALJ John Price conducted a hearing on June 1, 2010, in San Rafael, California.  AR 25.  The ALJ

14   inquired at length as to whether Plaintiff wished to be represented by counsel at the hearing, and

15   Plaintiff opted to participate in the hearing without the benefit of counsel.  AR 42-44.

16       The ALJ issued an order on July 28, 2010, denying benefits.  AR 33.  The ALJ found that

17   Plaintiff had four severe impairments: degenerative disc disease of the cervical spine status post

18   fusion in 1998; hydrocephalus with associated epilepsy and imbalance; obesity; and alcohol

19   dependence.  AR 27.  The ALJ then found that Plaintiff had not been under a disability at any time

20   from May 22, 2007, the alleged onset date, through July 28, 2010, the date of the opinion.  AR 32-

21   33.  The Appeals Council denied Plaintiff's request for review on May 27, 2011, but accepted six

22   evidentiary exhibits, including MRI results dated July 6, 2010, treatment notes from Plaintiff's

23   treating physicians, Drs. Goltz and Mendius, and briefs and letters.  The Appeals Council ordered

24   that these exhibits were to be made part of the Administrative Record.  AR 5.

25       On July 8, 2011, Plaintiff timely sought judicial review of the final decision denying her Social

26   Security Income disability benefits.  Complaint, ECF No. 1.  After Plaintiff declined assignment to a

27   magistrate judge, the case was reassigned to a district judge.  9/28/2011 Order of Reassignment,

28   ECF No. 14.  By June 2012, the parties' crossmotions for summary judgment were fully briefed and

UNITED STATES DISTRICT COURT
For the Northern District of California

ORDER (C11-3379 LB)

2

1   ripe for decision.  Motion, ECF No. 22; Opposition and Cross-Motion, ECF No. 23; Reply, ECF No.

2   24.

3       Since that date, Carolyn Colvin  replaced Mr. Astrue as the Commissioner of Social Security

4   Administration (and as Defendant to this action), and several attorneys replaced one another as

5   Plaintiff's legal representative.  First Notice of Substitution, ECF No. 25; Second Notice of

6   Substitution, ECF No. 26; Third Notice of Substitution, ECF No. 30.  Plaintiff also filed a request

7   for judicial notice that asks the court to consider her subsequent award of Social Security benefits in

8   a different proceeding.  First Request for Judicial Notice, ECF No. 28; Second Request for Judicial

9   Notice, ECF No. 29.

10      On June 27, 2014, the district judge directed the parties to inform her whether they consented to

11  a magistrate judge presiding over this action.  Order re Consent, ECF No. 31.  They did, and on June

12  2, 2014, the case was reassigned to this court.  Order Reassigning Case, ECF No. 35.  Given

13  the time that had passed since the pending cross-motions were filed, the lack of continuity

14  among Defendant's counsel, and Plaintiff's subsequent award of benefits in a different

15  proceeding, the court directed the parties to meet and confer about what effect, if any, those awarded

16  benefits had on the pending motions and to provide the court with a joint status update by

17  July 10, 2014. The court then ordered supplemental briefing. *See* ECF Nos. 41, 43.

## III.  LEGAL STANDARD

### A.  Standard of Review

20      Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the

21  Commissioner if the plaintiff initiates the suit within 60 days of the decision.  District courts may set

22  aside the Commissioner's denial of benefits only if the ALJ's  "findings are based on legal error or

23  are not supported by substantial evidence in the record as a whole."  42 U.S.C. § 405(g); *Vasquez v.*

24  *Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted).  "Substantial evidence means more

25  than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind

26  might accept as adequate to support a conclusion."  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir.

27  1995).  If the evidence in the administrative record supports both the ALJ's decision and a different

28  outcome, the court must defer to the ALJ's decision and may not substitute its own decision.  *See*

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    *id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999).

2    **B.   Applicable Law: Five Steps To Determine Disability**

3       An SSI claimant is considered disabled if (1) he suffers from a "medically determinable physical

4    or mental impairment which can be expected to result in death or which has lasted or can be

5    expected to last for a continuous period of not less than twelve months," and (2) the "impairment or

6    impairments are of such severity that he is not only unable to do his previous work but cannot,

7    considering his age, education, and work experience, engage in any other kind of substantial gainful

8    work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(A) & (B).

9       The Social Security regulations set out a five-step sequential process for determining whether a

10   claimant is disabled within the meaning of the Social Security Act.  *See* 20 C.F.R. § 404.1520.  The

11   five steps are as follows:

12   **Step One.**  Is the claimant presently working in a substantially gainful activity?  If so, then the
13   claimant is "not disabled" and is not entitled to benefits.  If the claimant is not working in a
     substantially gainful activity, then the claimant's case cannot be resolved at step one, and the
14   evaluation proceeds to step two.  *See* 20 C.F.R.§ 404.1520(a)(4)(I).

15   **Step Two.**  Is the claimant's impairment (or combination of impairments) severe?  If not, the
     claimant is not disabled.  If so, the evaluation proceeds to step three.  *See* 20 C.F.R. §
16   404.1520(a)(4)(ii).

17   **Step Three.**  Does the impairment "meet or equal" one of a list of specified impairments
     described in the regulations?  If so, the claimant is disabled and is entitled to benefits.  If the
18   claimant's impairment does not meet or equal one of the impairments listed in the regulations,
     then the case cannot be resolved at step three, and the evaluation proceeds to step four.  *See* 20
19   C.F.R. §§ 404.1520(a)(4)(iii).

20   **Step Four**.  Considering the claimant's residual functional capacity, is the claimant able to do
     any work that he or she has done in the past?  If so, then the claimant is not disabled and is not
21   entitled to benefits.  If the claimant cannot do any work he or she did in the past, then the case
     cannot be resolved at step four, and the case proceeds to the fifth and final step.  *See* 20 C.F.R. §
22   404.1520(a)(4)(iv).

23   **Step Five.**  Considering the claimant's residual functional capacity, age, education, and work
     experience, is the claimant able to "make an adjustment to other work?"  If not, then the claimant
24   is disabled and entitled to benefits.  *See* 20 C.F.R. § 404.1520(a)(4)(v).  If the claimant is able to
     do other work, the Commissioner must establish that there are a significant number of jobs in the
25   national economy that the claimant can do.  There are two ways for the Commissioner to show
     other jobs in significant numbers in national economy: (1) by the testimony of a vocational
26   expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart
     P, app. 2.  If the Commissioner meets this burden, the claimant is not disabled.

27      For steps one through four, the burden of proof is on the claimant.  At step five, the burden shifts

28   to the Commissioner.  *See Tackett*, 180 F.3d at 1098.

UNITED STATES DISTRICT COURT
For the Northern District of California

### IV.  SUMMARY OF RECORD AND ADMINISTRATIVE FINDINGS

This section summarizes (A) the medical evidence in the administrative record, (B) Plaintiff's testimony, and (C) the ALJ's findings.

**A.  Medical Evidence**

Plaintiff, now 58, originally alleged that she was disabled as a result of six herniated discs in her neck.  AR 179.  At the time of her ALJ hearing, she also presented the ALJ with medical evidence that included information about conditions of hydrocephalus with associated epilepsy and imbalance, obesity, alcohol dependence, and degenerative disc disease of the cervical spine.  AR 27.

**1.  Dr. Sponzilli: Treating Physician**

Plaintiff saw Dr. Eugene Sponzilli, a neurologist at Mt. Tam Orthopedics, from June 2007 to November 2007.  AR 183.  He prescribed her pain killers, an epidural, and physical therapy.  *Id.*

On August 3, 2007, Dr. Sponzilli wrote a letter to the insurance company[3] appealing the denial of nerve root block treatment.  AR 281.  In this letter he notes Plaintiff's "motor and sensory abnormalities" and her need for the nerve block in order to "tolerate significant activity."  *Id.*

On September 5, 2007, Nurse Lisa Elvin and Dr. Sponzilli wrote a follow-up evaluation letter from Mt. Tam Orthopedics to the insurance company.  AR 279.  The letter notes that Plaintiff received the epidural on August 22, 2007.  The letter also notes that, as a result, Plaintiff "returns to the practice reporting that she is approximately 95% improved from her usual symptomatology of neck pain and arm pain," although she still has problems bending over and weakness in her right arm.  *Id.*  Through the letter, the doctor requests physical therapy for Plaintiff and finds her still "temporarily totally disabled until October 15, 2007."  AR 279.

On November 28, 2007 the physical therapist reported to Dr. Sponzilli that Plaintiff had 11 sessions of physical therapy.  AR 283.  The notes indicate that her neck symptoms "have improved significantly" and that she has full range of motion in her cervical spine.  *Id.*  The physical therapist stated that Plaintiff's main problem at that time was with balance, but that this issue had improved over the last few weeks.  The treatment notes also state that Plaintiff was walking 6 out of 7 days per

---

[3] This letter appears to be in relation to Plaintiff's Worker's Compensation claim.

1  week.  *Id.*

2  On November 29, 2007, Dr. Sponzilli wrote a letter to the insurance company in which he notes

3  Plaintiff's "postfusion syndrome" and confirmed that her July 2007 MRI showed spondylolisthesis

4  and spondylosis above and below the fusion.  AR 277.  He also noted that she was treated with an

5  epidural in August 2007, which was "helpful" to her.  *Id.*  Without specifying the details, the letter

6  also stated that Plaintiff was counseled regarding activity modification, medication management and

7  home exercise."  *Id.*

8  In 2008,  Dr. Sponzilli  referred Plaintiff for two MRI procedures: one of her spine and one of

9  her brain.  The MRI of her spine was conducted on April 23, 2008, and showed broad-based disc

10  protrusion and neural foraminal narrowing, but noted that these conditions were "not significantly

11  changed compared to prior study dated 07/17/07."  AR 285.  The MRI of Plaintiff's brain was

12  conducted on April 24, 2008 and showed "moderate atrophy" and ventricular enlargement, which

13  raised the possibility of "normal pressure hydrocephalus."  AR 286.

14  **2.  Dr. Lipshitz:  Treating Physician**

15  Dr. Darren Lipshitz appears to have been Plaintiff's treating physician since 2003.  AR 322.

16  Plaintiff saw Dr. Lipshitz on June 4, 2007.  AR 307.  The treatment notes state that Plaintiff was

17  having "pain and spasm" down her left arm.  *Id.*  Plaintiff's pain levels vary over time.  In the notes

18  from the June 28, 2007 visit, Plaintiff's pain is noted to be "8-9/10."  AR 310.  The October and

19  November 2007 treatment notes make reference to pain medications, but the November 16, 2007

20  notes indicate Plaintiff's reporting that "pain is fine."  AR 308-9.

21  On June 28, 2007, Dr. Lipshitz completed a California State Employment Development

22  Department (EDD) questionnaire stating that Plaintiff was unable to perform her regular or

23  customary work beginning on June 4, 2007, but that he anticipated releasing her to return to her

24  regular/customary work by August 4, 2007.  AR 351.

25  The treatment notes reference Plaintiff's relationship with alcohol.  The January 2006 notes

26  reference Plaintiff's time in an alcohol rehabilitation facility and her success in abstaining from

27  alcohol for six weeks.  AR 312.  The July 31, 2007 notes state that Plaintiff "quit drinking 2 wks ago

28  - 'got sick'."  AR 310.  The June 23, 2008 notes from Dr. Lipshitz indicate that Plaintiff was "having

1    falls on her left side" and that she was "drinking again."  AR 306.  The July 15, 2008 treatment notes

2    state that Plaintiff was "drinking much less."  AR 305.

3       The medical records provided from Dr. Lipshitz also include records from Marin General

4    Hospital documenting Plaintiff's falls.  On May 25, 2008, the treatment notes from the hospital

5    indicate that Plaintiff fell "while intoxicated." AR 323.  The records also state that "patient has a

6    history of multiple falls and significant alcohol intake in [sic] with multiple ER visits for this in the

7    past."  AR 323-25.

8       On April 11, 2008, Plaintiff was again seen in the ER for a fall.  The ER physician noted that the

9    testing indicated an elevated level of alcohol in her blood, but Plaintiff denied a problem with

10   alcohol.  AR 327.

11      **3**.  **Dr. Mendius: Treating Physician**

12      Dr. Mendius wrote a "To Whom it May Concern" letter in January 2010 stating that Plaintiff's

13   "seizures and hydrocephalus arise from a congenital birth defect, and are permanently disabling."

14   AR 441.  Subsequently, in June 2010, Dr. Mendius provided an evaluation which found that Plaintiff

15   was able to lift and carry up to 20 pounds occasionally, could sit for 4 hours at one time and stand

16   and walk for 2 hours at one time, could occasionally reach, handle, finger and feel with her right

17   hand, but never push and pull, and could frequently operate foot controls.  AR 453-55.  Dr. Mendius

18   found that Plaintiff could occasionally climb ramps and stairs and balance, but could never climb

19   ladders or scaffolds, stoop, kneel, crouch or crawl, and he also assessed visual and environmental

20   limitations.  AR 456. Dr. Mendius found that Plaintiff could shop, travel without assistance,

21   ambulate, walk a block at a reasonable pace, use public transportation, climb a few steps, care for

22   her personal hygiene, and sort, handle, and use paper/files.  AR 458.

23      Plaintiff testified that she drank some wine each day at the direction of Dr. Mendius (AR 69),

24   but no such indication is found in the medical records.

25      **4. Eva Dahl: Treatment Provider**

26      Ms. Dahl provided Plaintiff with chiropractic treatment for her work-related injury over the

27   period May to June 2007.  AR 182.  The relevant treatment notes include references to pain in

28

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Plaintiff's left arm and left hand, a stiff neck, and pain down her right arm.[4]  AR 266, 268, 271, 274.

2    Plaintiff said in a form that she provided as part of her disability benefits application that after "two

3    weeks of no success" by Ms. Dahl in treating this injury, Plaintiff was referred back to her primary

4    care physician, Dr. Lipshitz.  AR 183.

5    **5. Dr. Lavorgna: Worker's Compensation Consultative Physician**

6        Dr. Lavorgna examined Plaintiff on August 16, 2007, February 11, 2008, and December 17,

7    2008, all in connection with her Worker's Compensation claim.  On February 23, 2009, Dr.

8    Lavorgna issued a Supplemental Report based on review of additional medical records.

9        On August 16, 2007, Dr. Lavorgna found that Plaintiff had "neck pain with radiation to the left

10   arm down to the elbow."  AR 376.  He noted that she had an "excellent result" from her 1998 neck

11   fusion surgery, and that she had continued to work full time and full duty subsequent to that

12   operation.  AR 377.  Dr. Lavorgna reported that Plaintiff had worked out of her home and would be

13   able to continue to do so, but that she was not aware of any positions which would allow for that.

14   AR 378, 383.  He noted that Plaintiff could sit comfortably for the hour of the interview, and that she

15   arose from the chair "with hesitation but without support."  AR 379.

16       Dr. Lavorgna re-examined Plaintiff on February 7, 2008.  He said that Plaintiff reported

17   "continued neck pain with some lower back pain," but that "her left arm pain has resolved after a

18   cervical epidural."  AR 369.  Plaintiff also reported to Dr. Lavorgna at that time that she had left leg

19   weakness, that she had fallen multiple times since her work injury, and that she has trouble climbing

20   stairs due to her balance issues.  AR 369-70.  Dr. Lavorgna again notes that Plaintiff was able to sit

21   during the 45 minutes of the interview, but that she "appeared uncomfortable."  AR 370.

22   Dr. Lavorgna concluded that Plaintiff had "increased reflex activity" in the left upper arm, and that

23   she had "limited asymmetric range of motion."  AR 374.  He found her to have a "total temporary

24   disability at the present time" due apparently mostly to her falls and he referred her for a

25   neurological examination.  AR 375.

26       Plaintiff next returned to Dr. Lavorgna on December 17, 2008.  At that visit, Plaintiff reported

27

28       [4]  The dates associated with each of these issues are difficult to ascertain from the records
     provided.

1  continued neck pain with left radiating pain and frequent falls.  AR 357.  Dr. Lavorgna reported that

2  since his prior evaluation, Plaintiff had been evaluated by a neurologist, Dr. Mendius, and that she

3  had also had an MRI of her brain and an EEG.  Dr. Lavorgna said that Plaintiff "cannot tolerate a

4  long commute" or work a 10-hour day.  *Id.*  He further noted that her "condition has been the same

5  for a while" and that she was learning to "self accommodate for her tendency to fall."  AR 358.  Dr.

6  Lavorgna finds that Plaintiff has "significant signs of radiculopathy of the cervical spine due to pain

7  with positive neurologic findings in the form of increased reflexes," and that Plaintiff has the

8  following limitations:

9       can use a computer keyboard and mouse for only one half-hour at a time and then requires a
        10 to 15 minute break.  Her walking is variable, but only minimal walking on bad days.
10      Approximately every two weeks she requires a day of bed rest with the use of ice or heat.
        She can lift around five pounds and cannot do heavy pushing or pulling.  She cannot work
11      above shoulder level.  She is unable to move the neck frequently or hold the neck in
        prolonged positions.

12

13  AR 358, 363.

14       Finally during this visit, Dr. Lavorgna noted that Plaintiff requires additional medical care and

15  "possible future cervical spine surgery."  AR 363.

16       Additional medical records were sent to Dr. Lavorgna, and based on his review of those

17  additional materials, he provided a Supplemental Report dated February 23, 2009.  These records

18  included reports from Marin General Hospital related to a fall by Plaintiff while she was reportedly

19  intoxicated.  Dr. Lavorgna had been requested to respond in the Supplemental Report to the question

20  of whether Plaintiff's neurological condition was related to the work injury she sustained in May

21  2007.  Dr. Lavorgna concluded that it was not.  AR 355.

22  **6. Dr. Gallagher: State Agency Non-Examining Physician**

23       On May 5, 2009, Dr. Gallagher, acting as a Medical Consultant, filed a Physical Residual

24  Functional Capacity ("RFC") Assessment.  In the Assessment, Dr. Gallagher said that Plaintiff could

25  frequently climb, and occasionally perform other postural activities, and needed to avoid even

26  moderate exposure to hazards such as machinery and heights.  AR 387-90.  Dr. Gallagher cites the

27  December 2008 clinical findings of examining physician Dr. Lavorgna, which reflected good

28  cervical strength and range of motion, and full range of motion and good strength in both upper

UNITED STATES DISTRICT COURT
For the Northern District of California

ORDER (C11-3379 LB)

9

extremities.  AR 387.  Dr. Gallagher concludes that based on his medical review that there is not

"objective evidence of record of physical impairment which would reasonably preclude the

performance of at least light range physical work activity and there is not objective evidence of a

continuous 12-month interval" from the alleged onset where that range of physical activity has not

been possible.  AR 387-88.

**7. Dr. David Goltz: Treating Physician**

Dr. Goltz operated on Plaintiff's ankle to repair the break she sustained in her February 2010

fall.  Dr. Goltz also provided Plaintiff with follow-up care related to the surgery.  AR 504-516.  Dr.

Goltz met with Plaintiff on March 11, 2010, April 2, 2010 and May 14, 2010.  *Id.*  On June 11, 2010,

Dr. Goltz completed a "Medical Source Statement of Ability to Do Work-Related Activities" as part

of Plaintiff's application for Social Security benefits.  In that statement, he opined that Plaintiff was

able to frequently lift and carry up to 20 pounds, and could occasionally lift and carry up to 50

pounds.  AR 517-522.  He said that she could sit for 8 hours and could stand and walk for 4 hours,

and that she could operate foot controls with both feet frequently and frequently climb stairs, ramps,

ladders and scaffolding, balance, stoop, kneel, crawl and crouch.  *Id.*  Finally, he noted that she

"should be able to return to full physical activity" six months after her surgery date of March 1,

2010.  AR 522.  This statement does, however, note that he did not know the condition of her

abilities in certain areas where he was not treating her, such as her upper extremities.  AR 519.

**B. Plaintiff's testimony**

Plaintiff appeared before ALJ John Price on June 1, 2010.  AR 25.  The ALJ opened the

proceedings by explaining to Plaintiff her rights, including her right to have a legal representative at

the hearing.  *Id.*  She chose to appear at the hearing without representation.  AR 44.  The following is

a summary of the facts to which Plaintiff testified at that hearing.

The ALJ began reviewing the record with Plaintiff.  He noted that she had a history of cervical

back fusion in 1988[5] but that her surgical result had been good and that she had been able to work

after that surgery.  AR 45.  He reviewed with her that she had some chiropractic treatment for neck

---

[5]  The hearing record at this point reflects the date of 1988 for the fusion surgery but the
surgery, as accurately reflected elsewhere in the ALJ record, is actually in 1998.  *See e.g.*, AR 30.

UNITED STATES DISTRICT COURT
For the Northern District of California

stiffness in 1998 and also in 2006 when she had reported having some numbness in her left arm.  *Id.*  The record reflects that Plaintiff had worked until May 2007.  The ALJ reviewed with Plaintiff her MRI tests in July 2007 and April 2008 and her 2007 injection in her neck.  AR 46.  The ALJ noted that Plaintiff also had received some physical therapy.  *Id.*  Plaintiff confirmed that she had reported having frequent falls and that she had been treated on more than one occasion for those falls in the emergency room.  *Id.*  The ALJ noted the presence of two reviews by medical experts which were in the file as Exhibits 5F and 7F.  AR 47.

The ALJ reviewed with Plaintiff the reports from the neurologist in which she was diagnosed with hydrocephalus and localization-related epilepsy, which the neurologist had attributed to a congenital defect.  *Id.*  Finally, the ALJ noted that Plaintiff had suffered a fractured ankle in February 2010.  AR 48.  The ALJ discussed with Plaintiff the need for any updated medical records to add to her file.  AR 50.  The ALJ then reviewed with Plaintiff the standards for a finding of disability.  AR 52-54.  He also introduced the role of the vocational expert he intended to call upon during the hearing.  AR 54.

In response to questioning by the ALJ about her physical limitations, Plaintiff testified that it was "very hard to get dressed in the morning" and that it was also very hard to reach the floor and to put on her shoes.  AR 55.  Dr. Sponzilli had limited her from doing any "overhead work" and also that three different surgeons had limited her to lifting five pounds of weight.  *Id.*  This limitation was consistent with Plaintiff's personal experience of her limitations.  AR 62.

Plaintiff testified that in her role as an architect she had been required to be on site at buildings, climbing ladders for inspections of the job site, and that as a result, she had developed "severe  pain" along her "neck line."  AR 57.  She received an injection in the discs of her neck and that the benefit from that injection was "still lasting." AR 58.  She stated that she continued to have neck pain, but that the pain did not go into other areas of her body.  *Id.*  She also testified that she has "trouble turning her neck from left to right."  AR 61.  When she experiences the pain she "lay[s] down in bed" for 15 minutes or so at a time.  AR 61, 64.  Plaintiff testified that physical therapy was not very helpful to her.

The ALJ then inquired whether, after Plaintiff was injured, she had sought other employment

1    where she would not have to climb.  Plaintiff responded that as a senior architect, she was required

2    to visit building sites and go to the Building Department.  AR 59-60.  She denied that there were any

3    sorts of positions available to her such as drafting, which would just require desk work.  AR 59-60.

4        The ALJ then explored with Plaintiff her limitations on sitting.  Plaintiff said that she could only

5    sit comfortably for a "half hour to 45 minutes" and after that her "lower back goes." AR 60.  She

6    told the ALJ that she would soon be having an MRI on her lower back, although she also stated that

7    her lower back pain was treatable by her chiropractor and that treatment by the chiropractor lasts for

8    months.  AR 61.  She also said that in the past she had some pain down her left side, but that it did

9    not cause her trouble gripping objects.  AR 66.  When questioned about pain medication, Plaintiff

10   stated that she took "maybe one three times a week."  AR 64.

11       As to daily chores, Plaintiff makes meals, but enlists the aid of her son (who lives with her part

12   of the week) with household chores such as laundry and vacuuming, which would otherwise

13   "aggravate" her neck.  AR 63.  As an example, she cited washing dishes and said that the act of

14   leaning over the sink was painful such that she could only wash a few dishes at a time and then she

15   needed to take a break.  AR 63-64.  Plaintiff stated that she was able to drive and to dress herself and

16   shower.  AR 65.  As for showering, Plaintiff stated that she had fallen three times in the shower.  AR

17   66.

18       Plaintiff mentioned that the pain on her left side contributed to her history of falling.  AR 65-66.

19   The ALJ then asked her how long she had been experiencing  issues of falling.  Plaintiff said that it

20   was since she had "the surgical procedure," but that it had not been an issue when she was

21   inspecting roofs.  AR 67.

22       The ALJ noted that the medical records indicated more than one ER visits for falls, including the

23   most recent one in which she had suffered a broken ankle, which was healing.  AR 77.  When

24   questioned by the ALJ as to the frequency of her falls, Plaintiff testified that she fell "almost every

25   morning."  AR 68.  The ALJ noted that in the ER reports for April and May 2008 there were

26   references to the fact that Plaintiff had been drinking.  AR 74.

27       The ALJ questioned Plaintiff as to the cause of her falls.  She testified that the Worker's

28   Compensation doctor had referred her to a neurologist, who discovered her epilepsy.  AR 71.  The

UNITED STATES DISTRICT COURT
For the Northern District of California

1   ALJ noted that this condition was congenital, and yet had only recently manifested itself.  *Id*.

2      The ALJ reviewed with Plaintiff her history of alcohol dependence.  Although Plaintiff had

3   previously been in a rehabilitation facility, at the time of the hearing she stated that she had been

4   advised by Dr. Mendius to have a few drinks a day and that she drank two to three glasses of wine a

5   day.  She also testified that Dr. Lipshitz had advised her to keep to that limit of two to three drinks.

6   AR 69-70.  Plaintiff testified that she had been consuming that same amount of alcohol when she

7   had been working.  AR 73.  She further stated that the longest period of time she had gone without

8   drinking was two years, which included the time when she was pregnant with her son.  AR 74.

9      The ALJ then asked Plaintiff about her mental capacity and Plaintiff stated that she felt

10  cognitively able to work.  AR 78.

11  **C.  <u>Vocational Expert Testimony</u>**

12     Vocational Expert Robert Rashke testified at the hearing.  The expert first testified that the past

13  work performed by Plaintiff and the way architects work generally is performed at a "light level."

14  AR 82.  The ALJ then asked the Vocational Expert whether for a person with Plaintiff's background

15  and skill-set there would be any transferable skills to light or sedentary work.  The expert said that

16  many architectural positions were "sedentary in nature" and that someone who is an architect

17  "should be able to find work at the sedentary level either directly as an architect or maybe at some

18  subordinate position to an architect like a drafts person."  AR 84.  Plaintiff responded that she was

19  not a drafts person and that was "an actual insult" as she managed drafts people.  *Id*.

20     The expert further opined that Plaintiff's skills would be transferrable to other sedentary jobs

21  such as general clerical or general managerial positions.  Based on that, the ALJ asked Plaintiff

22  questions about her experience as a manager.  AR 86.  She explained that she was a project manager,

23  which required her to be out of the office either at a job site or the Building Department four out of

24  five days a week.  AR 86.

25     The ALJ then returned to questioning the Vocational Expert.  The ALJ asked the Vocational

26  Expert to assume a hypothetical person the age of Plaintiff, with a college degree and past work

27  experience as an architect and who can perform light work with the following limitations:

28

UNITED STATES DISTRICT COURT
For the Northern District of California

occasional[6] stooping, kneeling and crouching; no climbing, balancing, crawling or overhead work; no work near hazards such as dangerous heights and moving machinery; and the ability to stand and walk about two hours maximum in an eight-hour work day.  He then asked whether such a person could perform the type of work Plaintiff had performed in the past or work that is generally performed in the economy.  AR 88.  The expert responded that he would eliminate "light work," including the architectural jobs that Plaintiff had in the past, because they required more time on one's feet than the hypothetical allowed.  AR 88-89.  But as to architecture work generally, which the Vocational Expert defined as the "type of architect whose primary job is to create plans, meet with clients, have the plans approved, work up a team with draftsmen and get the thing done," that type of architect work would be possible under the hypothetical.  AR 89-91.  The Vocational Expert further opined that even if one were to add a restriction of no lifting over 10 pounds, would eliminate 50% of the labor market, there still would  be positions that could accommodate those restrictions.  AR 91.

The ALJ then inquired about the existence of non-architectural positions with the same physical limitations.  The Vocational Expert listed positions such as scheduler, information clerk, and order clerk as using Plaintiff's skill set and limitations, and also listed semi-skilled positions such as office clerk and animal control clerk.  AR 92-94.

The ALJ then refined the hypothetical to see the effect of an additional limitation of the individual needing to change positions from sitting to standing every 30 minutes.  AR 94.  The Vocational Expert answered that "none of the jobs that have the skill set that she does [that] would offer sit/stand options," including sedentary jobs, especially if the total amount of time one could remain standing during the day was two hours.  AR 95.  After some brief questioning of Plaintiff by the ALJ about the healing process for her ankle, the ALJ once again turned to the Vocational Expert to inquire whether any positions would allow an individual to "elevate their leg during the day. . . . For example at let's say knee height."  AR 98.  Plaintiff said, however, that she would need to elevate her leg above the heart level.  The Vocational Expert testified that while he believed 50

---

[6]  The ALJ said that by "occasional" he meant one-third of the day.

1   percent of employers could accommodate leg elevation to knee height,  a person who needed an

2   accommodation to elevate their leg above their heart "would be unemployable if that

3   [accommodation] had to happen for any length of time."  AR 99.

4   **D. <u>Administrative Findings</u>**

5       Applying the sequential evaluative process, the ALJ held on July 28, 2010, that Plaintiff was not

6   disabled under Section 216(I) and 223(d) of the Social Security Act during her alleged onset of

7   disability date, May 22, 2007, through the date of the decision, and therefore was not entitled to

8   disability insurance benefits.  AR 25.

9       At step one, the ALJ found that the claimant had not engaged in substantial gainful activity from

10   her alleged onset of disability date, May 22, 2007 through to the date of the decision.  AR 27.  The

11   decision notes that the Social Security Administration field office employee had recommended an

12   onset date of June 4, 2007, the last date Plaintiff had reported working.

13       At step two, the ALJ found that Plaintiff suffered from severe impairments of degenerative disc

14   disease of the cervical spine status post fusion in 1998, hydrocephalus with associated epilepsy and

15   imbalance, obesity, and alcohol dependence.  AR 27.  He found that her fractured left ankle was not

16   a severe impairment as there was no evidence that it would persist for more than twelve months.  AR

17   28.

18       At step three, the ALJ found that Plaintiff did not suffer from "an impairment or combination of

19   impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404,

20   Subpart P, Appendix I."  AR 28.  The ALJ looked at each of Plaintiff's impairments first

21   individually and then in combination.  As to obesity, the ALJ noted that obesity is not a listed

22   impairment.  He did take into consideration "the combined effects" of her obesity in "assessing the

23   effect the obesity has upon [her] ability to perform routine movement and necessary physical activity

24   within the work environment."   AR 28.

25       Although he did not specify that he was analyzing the effect of Plaintiff's broken ankle, the ALJ

26   found no evidence in the record of a major dysfunction of a joint, or that the surgery to her ankle

27   would result in a disability as she was able to "ambulate effectively."  AR 28.

28       As it related to her spine, the ALJ stated that "to meet or equal listing 1.04, a disorder of the

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

UNITED STATES DISTRICT COURT
For the Northern District of California

1  spine must be corroborated by medically acceptable clinical and imaging studies supporting

2  evidence" of a nerve root compression and associated limitations.  The ALJ found that the "medical

3  evidence of record does not contain all of the required evidence."  AR 28.

4      In looking at her diagnosis of epilepsy, the ALJ stated that he considered listings 11.02 and 11.03

5  but found them not to apply.  AR 29.  As to whether there is evidence that the epilepsy had caused

6  "significant and persistent disorganization of motor function in the two extremities" to meet the

7  requirements of listing 11.04B or 11.14, the ALJ found no evidence in the record.

8      Finally, the ALJ looked to listing 12.09 to see whether there was sufficient evidence of severe

9  "behavioral changes or physical changes associated with the regular use of substances that affect the

10  central nervous system."  AR 29.  Again, he found that the record did not contain sufficient evidence

11  in this regard.  *Id*.

12      At step four, the ALJ found that Plaintiff had the residual functional capacity to perform light

13  work as defined by 20 C.F.R. § 404.1567(b), with the following limitations: lifting and carrying ten

14  pounds frequently and twenty pounds occasionally; standing and walking for a total of two hours in

15  an eight-hour workday; stooping, kneeling and crouching occasionally; no climbing, balancing,

16  crawling, or engaging in overhead work; and no work around hazards such as heights or dangerous

17  moving machinery.  AR 29.

18      In making this finding, the ALJ considered all of Plaintiff's symptoms and how consistent they

19  were with the objective medical evidence (based on the requirements of 20 C.F.R. § 404.1529 and

20  Social Security Rulings 96-4p and 96-7p).  AR 29.  He also considered opinion evidence under 20

21  C.F.R. § 404.1527 and Social Security Rulings 96-2p, 96-5p, 96-6p, and 06-3p.  *Id*.  He followed a

22  two-step process, first determining whether there was a medically-determinable physical or mental

23  impairment that reasonably could be expected to produce Plaintiff's pain and other symptoms, and

24  then evaluating the intensity, persistence, and limiting effects of the symptoms to determine the

25  extent that they limited Plaintiff's ability to do basic work activities.  *Id*.  For the second part,

26  whenever Plaintiff's statements about the intensity or functionally limiting effects of pain or other

27  symptoms were not substantiated by objective medical evidence, the ALJ made findings on the

28  credibility of the statements "based on a consideration of the entire record."  *Id*.

ORDER (C11-3379 LB)

The ALJ first reviewed Plaintiff's testimony at the hearing.  As it related to her daily routine, the ALJ noted that Ms. Plaintiff had testified that "it is very hard for her to get dressed" and that "taking a shower, putting on her shoes, and reaching the floor is very difficult."  AR 30.  He reviewed Ms. Nielsen's stated limitations of lifting five pounds, and sitting and standing for fifteen minutes.  He noted that she found relief in chiropractic adjustments, and that she had the help of her son for various chores around the house.  *Id*.  The ALJ recounted Ms. Nielsen's testimony that she had fallen a number of times, resulting in at least one visit to the emergency room.  Ms. Nielsen's testimony also included the fact that she drank a few glasses of wine a day to calm down, and that she was instructed to do so by her physician.  The ALJ referenced Ms. Nielsen's testimony that she was cognitively able to work, but that she would not move to another location for work.  *Id*.  The ALJ recapped that, as to Ms. Nielsen's daily activities, she continued to drive despite her reports of seizure activity and that she was able to walk, and she was able to grocery shop with assistance.  The ALJ also recounted that Plaintiff reported that she could take public transportation and that she could stand for thirty minutes and sit for thirty to forty-five minutes.  AR 32.

The ALJ then reviewed the medical evidence in the record.  He began with Plaintiff's cervical fusion in 1998.  AR 30.  He noted that the MRI in July 2007 showed spondylolisthesis and spondylosis above and below the fusion, and that the April 2008 MRI showed disc protrusion and "moderate bilateral neural forminal narrowing and stable interbody fusion."  *Id*.

The ALJ noted that in May 2007, Plaintiff reported significant neck and left arm symptoms, where previously she had reported neck and right arm symptoms to her employer.  *Id*.  The ALJ then reviewed the medical evidence provided by Dr. Lavorgna.  The ALJ referenced Plaintiff's visits with Dr. Lavorgna in August 2007 and December 2008, when Dr. Lavorgna noted that Plaintiff was able to sit comfortably for the one-hour.  The ALJ also referenced a statement by Dr. Lavorgna that Plaintiff "could engage in lighter duty employment than her prior job that required her to go out to the field and inspect structures."  AR 30.  Finally the ALJ recounted Dr. Lavorgna's February 2009 conclusions that the premature atrophy observed in Plaintiff's brain was "possibly related to a history of alcohol intake."  *Id*.

The ALJ recounted that the April 2008 brain MRI also showed "ventricular enlargement raising

UNITED STATES DISTRICT COURT
For the Northern District of California

1  the possibility of normal pressure hydrocephalus." AR 30.  The ALJ then noted Plaintiff's two trips

2  to the emergency room in April and May 2008 and that there was indication in the medical records

3  for those two visits that alcohol use could be implicated in the falls, and that on one occasion

4  because of Plaintiff's blood alcohol level, the hospital required Plaintiff to contact a friend to drive

5  her home. *Id*.

6      As to the State Agency medical consultant determination, the ALJ reported that in May 2009, the

7  Agency determined that Plaintiff "could engage in less than a full range of light activity" and that

8  this determination was affirmed in September 2009.  AR 30.

9      The ALJ refers to a doctor's visit in 2010 when Plaintiff was unable to tell the doctor why she

10  was on disability other than that she had fallen off a ladder, and her report that when she was not in

11  pain, she could walk two to three miles a day.  He noted that the doctor's assessment included

12  "alcoholic hepatitis and alcohol abuse."  AR 30.

13      The ALJ then reviewed at length the recent surgery to Plaintiff's ankle and her orthopedic

14  surgeon Dr. Goltz's June 2010 assessment that Plaintiff could carry fifty pounds occasionally and

15  twenty pounds frequently and that she could sit eight hours and stand four hours of an eight hour

16  day.  Finally, the ALJ noted that according to Dr. Goltz, Plaintiff should be able to return to full

17  physical activity six months after the date of the surgery.  AR 31.

18      The ALJ then looked at the treatment Plaintiff had received from neurologist Dr. Mendius and

19  his June 2010 medical source statement.  The ALJ referenced Dr. Mendius's assessment that

20  Plaintiff (1) could occasionally lift up to twenty pounds, (2) could stand and walk up to two hours at

21  a time and sit for up to four hours at a time, (3) could reach, handle, finger and feel with her right

22  hand (but never push or pull with her right hand), (4) should never climb ladders or scaffolding or

23  stoop, kneel, crouch or crawl, and (5) must avoid hazards such as unprotected heights and moving

24  parts but could occasionally climb stairs and ramps and balance. *Id*.

25      The ALJ referred also to a letter from Dr. Mendius dated January 2010, in which he opined that

26  Plaintiff's "seizures and hydrocephalus were permanently disabling."  AR 31.  The ALJ gave "little

27  weight" to this assessment of disability by Dr. Mendius, finding it "inconsistent with the assessment

28  of other treating and examining sources." *Id.*  The ALJ also rejected the report as having relied too

1    heavily on "the subjective report of symptoms and limitations provided" by Plaintiff and that Dr.

2    Mendius had appeared to uncritically accept her proffered limitations as true. *Id*. The ALJ noted

3    that he did accept those aspects of Dr. Mendius's report which he found consistent with the Residual

4    Function Capacity. *Id*.

5         The ALJ also gave reduced weight to the State Agency medical consultants and Dr. Goltz's

6    reports, finding that the evidence supported greater limitations on Plaintiff's mobility than those

7    reports indicated. AR 31. The ALJ focused instead on Dr. Lavorgna's medical reports, in which Dr.

8    Lavorgna noted that Plaintiff had suffered a severe neck impairment and was advised to limit herself

9    to performing light duty work. *Id*.

10        Based on consideration of all of the evidence above, the ALJ found that Plaintiff's "medically

11   determinable impairments could reasonably be expected to cause the alleged symptoms; however,

12   [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms

13   were not credible to the extent they were inconsistent" with the Residual Functional Capacity

14   assessments. AR 32. The ALJ recounted Plaintiff's stating at the hearing that she was not interested

15   in work that would be less remunerative than her work as an architect. *Id*. The ALJ also took into

16   consideration that Plaintiff's alcohol consumption might be contributing to her falls as much as her

17   hydrocephalus, which condition she had had for her whole life. AR 32.

18        At step five, the ALJ found that Plaintiff was capable of performing past relevant work as an

19   architect because there were positions in that field that would be consistent with her Residual

20   Functional Capacity. AR 32. The ALJ based his decision in part on the testimony of the Vocational

21   Expert that, while Plaintiff could not return to her former work as an architect, there were

22   architectural jobs in the national economy and significant numbers of jobs in the national and Bay

23   Area economies that were consistent with Plaintiff's work history and Residual Functional Capacity.

24   As to available positions for sedentary semi-skilled work available, the ALJ included those testified

25   to by the Vocational Expert including the following: information clerk; order clerk; and animal

26   control clerk.

27        Based on the above, the ALJ rendered a decision that Plaintiff was not disabled under sections

28   216(I) and 223(d) of the Social Security Act from May 22, 2007 to the date of the decision.

ORDER (C11-3379 LB)

UNITED STATES DISTRICT COURT
For the Northern District of California

# V. DISCUSSION

## A. <u>Subsequent SSI Determination and Sentence Six Remand</u>

After receiving the July 28, 2010 determination by ALJ Price finding her not disabled, Plaintiff filed a separate, subsequent application for disability supplemental security income (SSI).  On June 27, 2013, the Social Security Administration issued a finding that Plaintiff was disabled because of a progressively worsening cervical instability.  The onset date of disability for that filing was July 14, 2011.

In her supplemental brief, Plaintiff argues that the Commissioner's subsequent decision granting benefits, and the underlying evidence submitted to ALJ Gonzalez in the second application, are new and material evidence relevant to this action that warrant remand under 42 U.S.C. §405(g), sentence six.  Sentence six provides in relevant part:

> The court . . . may at any time order additional evidence to be taken before the commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. . . .

42 U.S.C. § 405(g).

Under the Social Security Act, "a material fact" is "one which the Commissioner of Social Security may consider in evaluating whether an applicant is entitled to benefits." 42 U.S.C. § 1320a-8(a)(2).  The good cause standard  is satisfied when new evidence, which surfaces after the final decision subject to judicial review, could not have been obtained by Plaintiff in order to be reviewed at the time of the administrative proceeding.

The evidence alluded to by Plaintiff in her current motion consists of medical records from 2010-2012, dates which are subsequent to ALJ Price's decision.  Nonetheless, Plaintiff argues that the records are relevant as they "substantiat[e] that earlier prognosis concerning the condition of Plaintiff's spine was unduly optimistic."  Pl. Supp. Brief at 1:23-2:5.  Plaintiff additionally refers the Court to neuropsychological testing performed several months after ALJ Price's decision which she asserts prove that even at the time of ALJ Price's decision, she was incapable of performing in a

1   competitive work environment due to cognitive impairment.[7]

2       ALJ Gonzalez found Plaintiff disabled on the basis of her cervical medical impairment alone.

3   ECF 28-1 at 5.  However, ALJ Gonzalez based his finding in large part on a second neck surgery

4   which Plaintiff had undergone on March 9, 2012, and ALJ Gonzalez specifically found that

5   Plaintiff's "condition changed significantly from the date of the prior ALJ's decision."  ECF 28-1 at

6   8.  Plaintiff acknowledges that ALJ Gonzalez's determination in and of itself does not compel a

7   finding that ALJ Price erred.  But she argues that it is relevant to a determination of whether she has

8   presented "new and material evidence" which compels this court to remand the case under 42 U.S.C.

9   § 405(g), sentence six.

10      In support of her position, Plaintiff cites *Luna v. Astrue*, 623 F.3d 1032, 1034 (9th Cir. 2010).

11  Defendant responds that the subsequent award in this case does not satisfy the standard for a

12  sentence six remand and that *Luna v. Astrue* does not alter this conclusion.

13      In *Luna*, plaintiff Luna applied for disability insurance benefits and supplemental security

14  income.  Her application was denied after an ALJ found that she was not disabled.  Luna

15  subsequently filed a second application for disability benefits, which was successful.  The

16  Commissioner identified Luna's disability onset date as the day after her first application was denied.

17  The district court ordered the matter remanded to the agency for further administrative proceedings

18  to reconcile the Commissioner's initial denial of benefits on the first application with the

19  Commissioner's later award of benefits.  Luna argued on appeal that, based on the Commissioner's

20  subsequent disability finding, the district court should have remanded with an order requiring the

21  payment of benefits for the time period relevant to her first benefits application.  The Ninth Circuit

22  disagreed and affirmed the district court's judgment.  *Id*.

23      As part of its analysis, the Ninth Circuit held that a close-in-time subsequent award of benefits

24  may constitute new and material evidence warranting remand if the reviewing court cannot reconcile

25  the determinations on the record before it.  *Luna*, 623 F.3d at 1035.  The *Luna* court distinguished

26

27  _____

28      [7]  The court notes that Plaintiff testified at her hearing with ALJ Price that she felt
    cognitively able to work, and that there was no evidence in the record at that point that substantiates
    her current claim that she was cognitively disabled.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   the facts from those in *Bruton v. Massanari*, 268 F.3d 824, 827 (9th Cir. 2001), where it rejected

2   claimant's request for remand.  *See Luna*, 623 F.3d at 1035.  This case is more like *Bruton* and not

3   like *Luna*.

4       Bruton's second application for disability benefits involved different medical evidence, a

5   different time period, and a different age classification.  Similarly, ALJ Gonzalez's determination of

6   disability was issued three years after ALJ Price's denial, evaluated Plaintiff's ability to work in two

7   distinct time periods almost a year apart, was based in substantial part on Plaintiff's subsequent neck

8   surgery in 2012, and specifically noted that the decision was based on a progressively worsening

9   condition since the time of the denial.  Moreover, in the second application, Plaintiff amended her

10  onset date to her 55th birthday, which changed the ALJ's analysis of the availability of a disability

11  award under the Medical-Vocational Guidelines from the rules governing that analysis in her first

12  application.[8]

13      The court concludes that there is no basis in the record for a sentence six remand.

14  **B.  Sentence Four Remand**

15      This section addresses the parties' argument in the original cross-motions for summary

16  judgment.

17      The Commissioner's decision must be affirmed upon review if it was supported by substantial

18  evidence and it was based on proper legal standards.  42 U.S.C. § 405(g); *Ukolov v. Barnhart*, 420

19  F.3d 1002, 1004 (9th Cir. 2005).  "Where evidence is susceptible to more than one rational

20  interpretation," the ALJ's conclusion must be upheld.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th

21  Cir. 2005).

22

23

24  ───────────────

25      [8] Plaintiff asserts that the onset date of her second application earlier was dictated by Social
    Security Ruling (SSR) 11-1p, which changed agency procedure to no longer process a subsequent
26  disability claim if the claimant had a claim still pending in the administrative review process (Doc.
    No. 41, p. 2, fn 2).  The Court notes that SSR 11-1p did not become effective until July 28, 2011,
27  two months after her denial by the Appeals Council.  Plaintiff points to no rule that would have
    prevented her from filing a second claim prior to that date.
28

ORDER (C11-3379 LB)

**1. The ALJ's Alleged Improper Rejection of Treating and Examining Sources in Determining Residual Functional Capacity**

Plaintiff first contends that the ALJ improperly rejected the opinion of treating physician Dr. Mendius embodied in a "to whom it may concern" letter dated  January 2010, in which he stated that Plaintiff's "seizures and hydrocephalus arise from a congenital birth defect, and are permanently disabling." AR 441.  She next contends that he failed to state sufficient support for his findings of Residual Functional Capacity and that such alleged failure is evidence that he failed to give "due consideration" to the diagnoses of all treating and examining physicians.  The court addresses each argument in turn.

*(a) Dr. Mendius's Finding That Plaintiff Was Permanently Disabled*

In January 2010, Dr. Mendius said in a "To Whom it May Concern" letter that Plaintiff's "seizures and hydrocephalus arise from a congenital birth defect, and are permanently disabling." AR 441.  Dr. Mendius does not specify any medical or clinical findings to support his assessment. In rejecting Dr. Mendius's January opinion, the ALJ found that it appeared that Dr. Mendius had heavily relied upon Plaintiff's subjective symptoms and limitations.  AR 31.  An ALJ may properly reject a physician's findings which are unsupported by the record or are premised on a claimant's properly discredited subjective complaints.  *See Bayliss v. Barnhart,* 427 F.3d 1211, 1217 (9th Cir. 2005).

No other treater or examiner found Plaintiff to be permanently disabled.  While Plaintiff asserts that it was an error for the ALJ to not rely on the findings of Dr. Lipshitz, Dr. Lipshitz found only that Plaintiff was precluded from her past work for a two month period and anticipated that she would be able to return to her past work at the end of that period.  AR 351; *see* 20 C.F.R. §§ 404.1505, 404.1509 (impairment must have lasted or be expected to last for a continuous period of at least 12 months or result in death in order to constitute a disabling impairment); *see also Flaten v. Secretary of Health and Human Services*, 44 F.3d 1453, 1459.  Similarly, Dr. Sponzilli found only that Plaintiff was completely unable to work for the period September 5 to October 15, 2007.  AR 279.

Because the opinions of treating physician Dr. Goltz and examining physician Dr. Lavorgna, which found Plaintiff able to work but with limitations, were based upon their independent treatment

1   and examination of Plaintiff, the court finds that they constitute substantial evidence supporting the

2   ALJ's rejection of Dr. Mendius's opinion.  *See Thomas*, 278 F.3d at 957; *see also Andrews v.*

3   *Shalala*,  53 F.3d 1035, 1041 (9th Cir. 1995) ("Where the opinion of the claimant's treating

4   physician is contradicted, and the opinion of a nontreating source is based on independent clinical

5   findings that differ from those of the treating physician, the opinion of the nontreating source may

6   itself be substantial evidence; it is then solely the province of the ALJ to resolve the conflict.").

7       This court also finds that Dr. Mendius's January 2010 letter is inconsistent with his own later

8   specific limitations assessment of Plaintiff made in June 2010.  20 C.F.R. § 404.1527(d)(4) ("the

9   more consistent an opinion is with the record as a whole, the more weight we will give to that

10  opinion"); *see also Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) ("The opinions of

11  non-treating or non-examining physicians may also serve as substantial evidence when the opinions

12  are consistent with independent clinical findings or other evidence in the record.").  For these

13  reasons, the court finds that the ALJ did not err by rejecting Dr. Mendius's January 2010 statement

14  that Plaintiff was permanently disabled.

15          ***(b)  The ALJ's Residual Functional Capacity Finding***

16       Plaintiff takes issue with the limitations in the ALJ's Residual Functional Capacity findings and

17  also argues that the record supported limitations that the ALJ should have, but did not include.  The

18  ALJ opinion should address the individual's remaining abilities to perform each of seven strength

19  demands: sitting, standing, walking, lifting, carrying, pushing, and pulling.  Each function must be

20  considered separately.  SSR 96-8P.

21       The ALJ found that Plaintiff had the Residual Functional Capacity to perform light work as

22  defined by 20 C.F.R. § 404.1567(b), with the following limitations: lifting and carrying ten pounds

23  frequently and twenty pounds occasionally; standing and walking for a total of two hours in an

24  eight-hour workday; stooping, kneeling and crouching occasionally; no climbing, balancing,

25  crawling, or engaging in overhead work; and no work around hazards such as heights or dangerous

26  moving machinery.  AR 29.  The ALJ's RFC does not address Plaintiff's ability to sit, push, or pull.

27       Plaintiff contests ALJ's Residual Functional Capacity finding on two grounds, arguing that (1) it

28

1    was based on the ALJ's improper rejection of the opinions of treating and examining sources,[9] and

2    (2) the ALJ improperly  discounted Plaintiff's testimony.

3         At the ALJ level, regulations for the Social Security disability program require consideration of

4    all of the medical evidence from "acceptable medical sources."  20 CFR § 404.1527(b).  An ALJ

5    "may disregard the treating physician's opinion whether or not that opinion is contradicted."

6    *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  An ALJ is not required to give controlling

7    weight to a treating physician's opinion unless it is well-supported and not inconsistent with other

8    substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2) ("If we find that a treating source's

9    opinion . . . is well-supported . . .and not inconsistent with the other substantial evidence in your

10   case record, we will give it controlling weight"); Social Security Ruling (SSR) 96-2p, 1996 WL

11   374188 (same).  An ALJ is required, however, to articulate valid reasons for the rejection of medical

12   opinions, especially those of a treating physician.  *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2005)

13   ("If the ALJ wishes to disregard the opinion of the treating physician, he or she must make findings

14   setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the

15   record."); *see also Miller v. Heckler,* 770 F.2d 845,849 (9th Cir. 1985).

16        Social Security Ruling 96–8p provides that an RFC assessment must "first identify the

17   individual's functional limitations or restrictions and assess his or her work-related abilities on a

18   function-by-function basis."  SSR 96–8p at *1.  *See also* 20 C.F.R. §§ 404.1545(b)-(d);

19   416.945(b)-(d).  ALJs have an affirmative duty to explain their determination of a claimant's

20   Residual Functional Capacity.  Social Security Ruling 96–8P, 1996 WL 374184, at *2 (July 2,

21   1996).  The RFC assessment must include a narrative discussion describing how the evidence

22   supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical

23   evidence (e.g., daily activities, observations).  The adjudicator must explain how any material

24   inconsistencies or ambiguities in the evidence in the case record were considered and resolved.  SSR

25   96–8p.

26

27        [9]  Plaintiff argues in her papers that since March 2004, her physicians have "uniformly
     opined" that she is "unable to work due to neck pain and imbalance."  Motion, ECF No. 22 at 3:14-
28   16.  This argument, however, ignores the uncontradicted fact that Plaintiff worked in a physically
     demanding position without limitation until her injury in 2007.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

As written, the ALJ's RFC assessment sets out the limitations he believes are appropriate and then provides a several-page narrative recounting the medical and testimonial evidence in the record he appears to have considered in reaching those limitations.  AR 29-32.  The ALJ did not, however, specifically support each finding of a limitation with references to the parts of the evidence in the record he believes support that individual limitation.  SSR 96–8p.  Nor did he explain – when there were conflicts in the medical records – how he resolved those inconsistencies.  *Id*.

This court nonetheless will review each of the limitations in the ALJ's Residual Functional Capacity findings to determine if they are supported by substantial evidence in the record, but first the court makes the following overarching observations.  The court notes that in crafting Plaintiff's Residual Functional Capacity, where there was a conflict in the evidence, the ALJ almost uniformly rejected the physician's opinions that would have required Plaintiff to engage in more physically demanding tasks.[10]

### *(1) Lifting and Carrying*

The ALJ found that Plaintiff could lift and carry ten pounds frequently and twenty pounds occasionally.  AR 29.  There is little agreement in the medical record about the appropriate lifting and carrying limitation.  Dr. Lipshitz did not set forth any functional limitations on the June 28, 2007 California State Employment Development Department (EDD) questionnaire he filled out.  AR 351.  Dr. Goltz opined that Plaintiff was able to frequently lift and carry up to 20 pounds and could occasionally lift and carry up to 50 pounds.[11]  AR 522.  Dr. Lavorgna's December 2008 assessment was that Plaintiff could only lift around five pounds.  AR 358.  Plaintiff testified at the hearing that she could only lift about 5 pounds.  The ALJ does not explain how he has arrived at the 10-pound lifting limitation as there is no medical evidence in the record that supports this particular limitation,

---

[10]  As noted below, in creating the Residual Functional Capacity finding, the ALJ concurred with most of Dr. Mendius's proposed limitations.  Plaintiff contends that the ALJ improperly gave treating physicians Dr. Goltz, Dr. Gallagher, and Dr. Lavorgna's opinions reduced weight; however, those physicians all recommended limitation which would have been more physically demanding on Plaintiff than those the ALJ incorporated into his RFC determination.

[11]  Dr. Goltz found that Plaintiff would be able to return to "full physical activity" 6 months after her left ankle surgery - i.e. about 3 months after Dr. Goltz's June 2010 assessment (AR 522).

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    nor is the limitation consistent with the other medical evidence or the testimony of Plaintiff.  The

2    court finds that this limitation requires at a minimum an explanation from the ALJ as to the

3    supporting substantial evidence.

4        Dr. Mendius did find that Plaintiff was able to lift and carry up to 20 pounds occasionally.  AR

5    453.  As he was a treating physician, the ALJ was entitled to give deference to his opinion, and this

6    limitation is supported by sufficient evidence in the record.

7                    *(2)  Standing and Walking*

8        The ALJ found that Plaintiff could stand and walk for a total of two hours in an eight-hour

9    workday.  Again this restriction is somewhat more lenient than that of Dr. Mendius from June 2010,

10   where he found that Plaintiff could stand and walk for 2 hours at one time.  In contrast, Dr. Golz

11   found that Plaintiff could stand and walk 4 hours without interruption.  AR 517-20.  Dr. Lavorgna

12   said in December 2008 that Plaintiff could only perform minimal walking "on a bad day," however

13   there is no indication in the record of the frequency of this situation.  AR 358.  The court finds that

14   this limitation has sufficient support in the record.

15                   *(3)  Stooping, Kneeling, and Crouching*

16       The ALJ found that Plaintiff could stoop, kneel and crouch occasionally.  AR 29.  This limitation

17   is inconsistent with Dr. Mendius's opinion that Plaintiff should never stoop, kneel, crouch or crawl

18   (AR 45), but it is consistent with Dr. Gallagher's testimony that Plaintiff could occasionally stoop,

19   kneel, or crouch.  AR 456.  Because Dr. Mendius was the treating physician, the ALJ needed to

20   explain on the record how he resolved this inconsistency.

21                   *(4)  Climbing, Balancing, Crawling, or Engaging in Overhead Work*

22       The ALJ found that Plaintiff should never climb, balance, crawl or engage in overhead work.

23   This limitation is in some ways more lenient to Plaintiff than Dr. Mendius's opinion that Plaintiff

24   could occasionally climb ramps but could never climb ladders or scaffolds.  AR 456.  In May 2009,

25   state agency non-examining physician Dr. Gallagher found that Plaintiff could frequently climb

26   ramps and occasionally climb ladders, balance, or crawl.  AR 456.  Because the  limitation embodied

27   in the RFC is more lenient than limitations supported by the record, the court finds sufficient support

28   for it in the record.

UNITED STATES DISTRICT COURT
For the Northern District of California

*(5) Work Around Hazards Such As Heights Or Dangerous Moving Machinery*

The ALJ found that Plaintiff should never work around hazards such as heights or dangerous moving machinery. AR 29. This limitation is consistent with Dr. Mendius's opinion. AR 457. In May 2009, state agency non-examining physician Dr. Gallagher found that Plaintiff needed to avoid even moderate exposure to hazards such as machinery and heights. AR 387-90. The limitations are supported by the record.

Plaintiff next argues that there were limitations that should have been part of the RFC assessment that the ALJ did not include. The court concurs that the ALJ did not, in either the narrative or final RFC assessment, provide an assessment of Plaintiff's physical ability to sit or push/pull as directed by SSR 96–8p. Given that Plaintiff testified that she was not able to sit for more than forty-five minutes without pain, and Dr. Mendius's limitation of sitting no more that four hours and limitations on Plaintiff's ability to push/pull, the court concurs that the ALJ needed to make findings on these issues as part of the RFC assessment.

Plaintiff also argues that the ALJ's Residual Functional Capacity analysis ignores Dr. Lavorgna's December 2008 statements that Plaintiff could use a computer keyboard and mouse for only one-half hour at a time, could not work above shoulder level, and was unable to move her neck frequently or hold her neck in prolonged positions. AR 358. Because Dr. Lavorgna assessed these limitations in the worker's compensation context, they are not binding on the ALJ. *See* 20 C.F.R. § 404.1504; *see also Macri v. Chater*, 93 F.3d 540, 544 (citing *Desrosiers*, 846 F.2d at 576). Moreover, these limitations conflict with the opinions of treating physician Dr. Goltz and non-examining state agency medical consultant Dr. Gallagher. AR 358. The ALJ could weigh the conflicting opinion evidence, but he also was required to give some indication as to how he had resolved the conflict. The ALJ need not recite "the magic words, 'I reject [a doctor's] opinion . . . because'"; nonetheless, there is no indication in the record about the ALJ's thought process in this regard. *See Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989).

## 2. Plaintiff's Subjective Pain and Symptom Testimony

The ALJ found that Plaintiff's impairments could cause some of her symptoms, but he found that her statements about the "intensity, persistence, and limiting effect of her symptoms" were not

UNITED STATES DISTRICT COURT
For the Northern District of California

1   credible to the extent that they were inconsistent with the ALJ's determination of residual functional

2   capacity.  AR 32.

3       To determine whether a claimant's testimony about subjective pain or symptoms is credible, the

4   ALJ must engage in a two-step analysis.  *See Vasquez*, 572 F.3d at 591 (citing *Lingenfelter v.*

5   *Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)).  First, the ALJ must determine whether the

6   claimant has presented objective medical evidence of an underlying impairment that reasonably

7   could be expected to produce the alleged pain or other symptoms.  *See Lingenfelter*, 504 F.3d at

8   1036.  Second, if the claimant meets the first test and there is no evidence of malingering, the ALJ

9   can reject the claimant's testimony about the severity of her symptoms only by offering specific,

10  clear, and convincing reasons for doing so.  *Id.*; SSR 96-7p.

11      When the ALJ finds a claimant's testimony not reliable, the ALJ must "specifically identify what

12  testimony is credible and what testimony undermines the claimant's complaints."  *Morgan*, 169 F.3d

13  at 499.  This court defers to the ALJ's credibility determination if it is supported by substantial

14  evidence in the record.  *See Thomas*, 278 F.3d at 959.

15      The ALJ identified several reasons for finding Plaintiff's testimony not credible.  The ALJ noted

16  Plaintiff's testimony that "she was not motivated to seek or perform work activity that was not as

17  remunerative as her past architect work" and that she "testified that her use of alcohol had not

18  detrimental affects" when the medical records indicated that alcohol use was "an on-going problem."

19  AR 32.  The court finds that Plaintiff's statements about her motivation to find less remunerative

20  work as reported by the ALJ in his decision are not in and of themselves a basis for finding her

21  overall testimony not credible.  The court notes that at the hearing, Plaintiff also testified that she

22  was "not against going back to work," but that she was "trying to figure out what" she could do.  AR

23  62.  The ALJ does not attempt to reconcile these statements to explain his credibility finding.

24      Reading the ALJ's RFC analysis, much mention is made of Plaintiff's relationship to alcohol.

25  AR 30-32.  In her testimony, Plaintiff ascribed her balance issues and falls to her hydrocephalus.

26  She denied to the ALJ that alcohol played a role in her falls, although the medical records indicate

27

28

1    otherwise.[12]  The ALJ was within his discretion to find Plaintiff's testimony not credible on the issue

2    of her falls and her ability to drive.  *See Thomas*, 278 F.3d at 959.  Nonetheless, as neither of those

3    abilities are in contention in the RFC analysis, the issue becomes whether Plaintiff's lack of

4    credibility in this area undermines all of her testimony as to her pain and other limitations.  The

5    court finds that in many ways, Plaintiff's testimony about her pain and her physical limitations have

6    some independent corroboration in the record, and that if the ALJ is rejecting her credibility on these

7    topics, he must make more specific findings on the record as to the basis for his determinations.

8                                         **VI. CONCLUSION**

9        The court **GRANTS IN PART** Plaintiff's motion for summary judgment and **DENIES** the

10   Commissioner's cross-motion for summary judgement.  The court **REMANDS** this case to the

11   Commissioner for further proceedings consistent with this order.

12       This disposes of ECF Nos. 22 & 23.

13       **IT IS SO ORDERED.**

14   Dated: September 24, 2014

                                            _____
15                                          LAUREL BEELER
                                            United States Magistrate Judge
16

17

18

19

20

21

22

23

24

25

26

27

28          [12]  The ALJ also notes that Plaintiff's hydrocephalus condition was determined to be
     congenital and had not previously impacted her ability to work.

UNITED STATES DISTRICT COURT
For the Northern District of California